*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MOE M. ALDOLEMY,

        Defendant-Appellant.

UNPUBLISHED
June 11, 2020

No. 344447
Oakland Circuit Court
LC No. 17-261887-FC

Before: STEPHENS, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Defendant, Moe M. Aldolemy, appeals as of right his jury trial convictions for solicitation of murder, MCL 750.157b(2), and felony firearm, MCL 750.227b. He was sentenced to 9 to 40 years' imprisonment for the solicitation to murder charge and 2 years' imprisonment for the felony firearm charge. We affirm.

## I. BACKGROUND

The relationships between the myriad persons involved in this case were complicated. Understanding those relationships is important for any analysis of this appeal. Testimony was adduced at trial to illuminate those relationships. The key actors in this case were: the defendant, his sister Iman Al-Dulaimi (Iman), that of the intended victim Ahmed Alobidi (Alobidi), Mike Alzand, and Hadeel Khalasawi, the person solicited to commit the murder. Alobidi first met the defendant within days of immigrating to the United States from Iraq, the common birth country of the defendant, Iman, Khalasawi, and Alzand. Alobidi lived with the defendant for a period of time until he was abruptly asked to leave the residence. The two were estranged for a period of time during which Alobidi began communicating with defendant's sister, Iman, whom he later married. In part due to immigration issues, Iman and Alobidi lived apart after their marriage and ultimately divorced. It was this divorce that the prosecution presented as defendant's motive for the solicitation to murder. Khalasawi testified that he met the defendant through Alzand, a person whom defendant blamed as a co-conspirator with Khalasawi to entrap him in this case. Alzand and defendant had some unsatisfactory business relationships.

The instant case began in early 2017, when defendant contacted Khalasawi. At the time, Khalasawi was awaiting trial along with Eric Farr for an arson committed at the defendant's gas station. Khalasawi admitted that he had hired Farr to commit the arson but insisted he did it at the behest of defendant who offered him a sizeable payment from insurance proceeds which were to flow from the arson. Defendant consistently denied any involvement in the arson. Khalasawi testified that he did not get paid for the arson. Khalasawi was angry about that lack of payment but more importantly was concerned that it had been defendant's gas station surveillance video which defendant gave to the authorities that led the police to Farr. Farr, once arrested, implicated Khalasawi who in turn implicated defendant. On the advice of counsel, Khalasawi had no contact with defendant from the time of Farr's arrest until January 2017. In January, defendant sent a message to Khalasawi on Facebook to which Khalasawi did not respond. Khalasawi testified that defendant then appeared unannounced at his family's restaurant, the Kabab and More, on January 20, 2017, and asked him to kill Alobidi. Wary of the defendant, Khalasawi recorded the January 20th conversation, held in Arabic, on his iPhone. Khalasawi contacted his lawyer, Dennis Johnston, shortly after the solicitation. Johnston contacted Sergeant Chad Finkbeiner (Finkbeiner), who was the officer in charge of the arson case. Law enforcement officers collaborated with several units of government on this case. Law enforcement secreted the intended victim, Alobidi, to a safe location and engaged Khalasawi in a plan to record evidence of the solicitation. Surveillance was set-up, and a January 31, 2017 meeting was arranged between Khalasawi and defendant. The meeting was observed by law enforcement and audio recorded. Funds were exchanged and Khalasawi gave the defendant the intended victim's wallet as proof of completion of the murder. Defendant was arrested after leaving the venue. Copies of the divorce papers between Iman and Alobidi were found in the defendant's car at the time of his arrest.

Khalasawi received a favorable plea agreement in exchange for his cooperation in this matter. The transcript of the plea proceeding revealed that under the agreement, Khalasawi, who was originally charged with multiple arson related offenses and facing possible lifetime imprisonment, pled to a misdemeanor with a sentence of no incarceration. Defendant's trial counsel was aware of the plea arrangement prior to the prosecutor in this case becoming aware of the plea deal. Khalasawi and Finkbeiner were examined in this regard. In that testimony, there was discussion of Khalasawi's immigration status. At the time of trial, Khalasawi, a two-time felon was detained by Homeland Security. Neither the defense nor the prosecution was privy to the transcription of the immigration court proceedings. Khalasawi was impeached on several details of his testimony including his assertion that he did not know Alobidi and needed a picture of Alobodi to execute the murder scheme. Additionally, Khalasawi was impeached regarding his failure to initially reveal the involvement of his friend, Omar Nasser. Khalasawi admitted, and Nasser testified, that after the initial contact between Khalasawi and the defendant regarding the murder, Nassar was the messenger sent to pick up $3,000 to $4,000, merchandise, and a picture of the intended victim from the defendant.

There were several other witnesses at trial including Steve Nissan, a disgruntled fired employee of the defendant. Nissan testified that a few months before the solicitation he heard the defendant threaten Alobidi. Testimony was also elicited from the law enforcement officers involved in the case regarding their surveillance and recordings. Their testimony was substantially similar to Khalasawi on the sequence of events.

Crucial to this case was the translation of the recorded conversations between Khalasawi and the defendant from Arabic to English. Both the prosecution and defense offered translations of these conversations. The prosecution's version came through a detective who was fluent in Arabic. The defense versions came from a "professional" translator and the defendant himself. An enhanced recording of one of the conversations was played for the jury during the defendant's testimony. Neither translator had been court certified. The versions of the conversation were substantively different.

Defendant testified at trial. He contended that his conversations with Khalasawi concerned the purchase of restaurant equipment. He explained that the exchange of money through Nassar was for the needed equipment. He testified that he considered buying a property at Nine Mile Road and Farmington Road from Knight Enterprises for a restaurant that would be like a middle eastern National Coney Island. He testified that he offered $285,000 for the property, but that the deal was never completed because his contact person got into a car accident. He explained the friction between himself and Khalasawi as being based upon his arriving at the Khalasawi family restaurant and exposing their arrangement to sell restaurant equipment. Defendant denied any animus against Alobidi, his then former brother in-law. He testified that he was the target of a conspiracy between several disgruntled persons including Khalasawi. The prosecution offered witnesses to rebut any sale of land with Knight Enterprises and the concept of National Coney Island franchise opportunities. Defendant explained that he was looking to build an independent business not a franchise.

The jury convicted the defendant as charged.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial counsel was ineffective for failing to investigate and call certain witnesses and for failing to investigate and disclose the full extent of Khalasawi's plea to the jury. For the reasons discussed below, we disagree.

## A. ISSUE PRESERVATION AND STANDARD OF REVIEW

To preserve an ineffective assistance of counsel claim, a defendant must move for a new trial or a *Ginther*[1] hearing in the trial court. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Defendant's claims are unpreserved where he took neither action in the trial court.

"A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. We review factual findings for clear error, but we review de novo questions of constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (internal citation omitted). Unpreserved claims of ineffective assistance of counsel are reviewed for mistakes apparent on the record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

## B. ANALYSIS

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

To establish ineffective assistance of counsel, defendant must prove "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Rockey*, 237 Mich App. 74, 76; 601 NW2d 887 (1999). "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (citation omitted). Similarly, "[t]he failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004).

Defendant first contends that his counsel was ineffective for failing to investigate and call five witnesses: 1) defense private investigator Steve Wittbort, 2) Ali Al-Marsoumi (Ali), 3) Zina Alzand (Zina), 4) Rafeh Al-Marsoumi (Rafeh), and 5) Iman.

Defendant argues that defense counsel was ineffective for failing to interview and call Wittbort, a private investigator hired by defendant, because Wittbort's testimony would have established that Khalasawi lied about how he obtained the picture of Alobidi and that Khalasawi tried to get Nasser to lie about the source of the picture. In his affidavit, Wittbort averred that Nasser said he used his own phone to duplicate a picture of Alobidi that was on defendant's phone and then sent it to Khalasawi. Wittbort averred that Nasser stated that Khalasawi and Alzand told him to lie to police and say that he took the picture of Alobidi while it was on Khalasawi's phone.

This argument fails because Wittbort's testimony would have been inadmissible. Wittbort's testimony about what Khalasawi and Alzand told Nassar was inadmissible hearsay. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible unless admissible under one of the exceptions to hearsay. *People v Shaw*, 315 Mich App 668, 673; 892 NW2d 15 (2016). Defendant contends that Khalasawi's and Alzand's statements to Nasser would have been admissible through Wittbort's testimony under MRE 803(24), the "catch-all" exception. Statements under MRE 803(24),

> must satisfy four elements to be admissible: (1) it must have circumstantial guarantees of trustworthiness equal to the categorical exceptions, (2) it must tend to establish a material fact, (3) it must be the most probative evidence on that fact that the offering party could produce through reasonable efforts, and (4) its admission must serve the interests of justice. Also, the offering party must give advance notice of intent to introduce the evidence. [*People v Katt*, 468 Mich 272, 279; 662 NW2d 12 (2003)].

We know that the preferred statements are double hearsay and thus deemed generally inadmissible. "Under MRE 805, hearsay within hearsay is excluded where no foundation has been

-4-

established to bring each independent hearsay statement within a hearsay exception." *Solomon v Shuell*, 435 Mich 104, 129; 457 NW2d 669 (1990). Wittbort, an agent of the defendant does not lend circumstantial credibility where the statements serve his client's interest and are not an admission against any significant interest of Nasser's. Wittbort's statements further fail to meet the third factor under MRE 803(24) because they were not the most probative evidence of Khalasawi's and Alzand's collusion to suborn perjury that defendant could produce through reasonable efforts; Nasser's testimony was. Nasser however, could not recall if he told Wittbort that Khalasawi or Alzand instructed him to lie about how he obtained the photo. At best, any testimony from Wittbort would have been impeachment against Nasser and not substantive evidence. Defense counsel named Wittbort on the defense witness list but ultimately elected not to call him. Since Nasser's contradiction of Khalasawi on other crucial matters such as Khalasawi receiving and retaining funds and goods from the defendant that he did not disclose to the police, and Khalasawi's failure to initially admit Nasser's role at all, it was not an unreasonable strategic choice not to call Wittbort. Defense counsel instead got a crucial admission from the prosecution's star witness. Counsel got Khalasawi to admit that he initially lied to the police and the court. Khalasawi, himself, admitted at trial that he had initially not been truthful about how he obtained Alobidi's picture and that he purposely omitted from his interview with detectives and at the preliminary examination Nasser's involvement in obtaining the picture in order to protect Nasser. In lieu of calling Wittbort to testify to impeach Nasser, defense counsel chose to ask Nasser whether it was true that he told Wittbort that Khalasawi told him to say that he obtained the picture in a different manner. "[T]his Court will not second-guess counsel regarding matters of trial strategy, and even if defense counsel was ultimately mistaken, this Court will not assess counsel's competence with the benefit of hindsight." *People v Rice*, 235 Mich App 429, 445; 597 NW2d 843 (1999). Defendant cannot overcome the strong presumption that defense counsel's decision to not call Wittbort and rather rely on Wittbort's report was sound trial strategy.

Defendant next argues that defense counsel was also ineffective for failing to either interview or call Ali and Zina, and to establish that Alzand had a motive to conspire with Khalasawi to falsify evidence against defendant. In his affidavit, Ali averred that in 2013, when he and defendant refused to loan Alzand money, Alzand said to Ali, "I will do something to Moe. I will get him locked up. I will put Moe away for life." Ali also stated that in 2013, he loaned Alzand his car and when Alzand would not return it, defendant retrieved it back for him. Defendant's actions left Alzand without a vehicle and according to Ali, Alzand told Ali's cousin that Alzand "was going to put [defendant] and [Ali] away for life." Ali lastly wrote that Alzand had a "reputation in the Arabic community of Macomb County, Michigan for being a dangerous person who seeks revenge against person [sic] who [Alzand] believes have done him wrong."

This argument fails, also. Ali's testimony as to what Alzand said would have been inadmissible hearsay. Defendant contends that Alzand's statement would have been admissible under MRE 803(3)[2] as Alzand expressing his state of mind. The statements however were

---

[2] "The following are not excluded by the hearsay rule, . . . [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief

allegedly made by Alzand in 2013 and therefore too remote in time to make a connection to the events of this case in 2017. Ali's testimony as to what Nissan said Alzand said would have been double hearsay and defendant offers no plausible argument on its admissibility under MRE 805. We agree that Ali's testimony as to Alzand's reputation would have been admissible under MRE 405(a)[3]. However, it was again, not an unreasonable strategic decision for counsel to focus on Khalasawi as the prevaricator because he was the person who accused defendant of solicitation to murder Alobidi.

The decision to not interview or call Zina did not render counsel ineffective either. Had counsel interviewed her, we must assume that she would have responded consistent with her affidavit. Accordingly, Alzand recounted to her that a detective told him that defendant accused him for the arson of his gas station, and that Alzand corrected him noting, "Thank God I was able to clarify that with the detective." While this testimony might have provided a motive for Alzand to conspire against the defendant for accusing him of arson, it would also have taken focus away from Khalasawi, who faced deportation and had been prone to be an inaccurate and disgruntled historian.

The decision not to call Rafeh does not meet the test for ineffective assistance of counsel either. Rafeh's affidavit stated that he saw Alzand, Alobidi and Khalasawi at the Home Depot together in July or August of 2017. Defendant argues that Rafeh's testimony would have proved that Khalawasi did not need a photo from defendant to recognize Alobidi. However, Khalasawi admitted he knew Alobidi prior to January 2017. Therefore, the fact that he was seen with Alobidi eight months later was unnecessary for that point. If by implication counsel meant to argue that the siting of the three in August was proof of their January conspiracy, a decision to forgo emphasis on the connection was not unreasonable.

Defendant also argues that his defense counsel was ineffective for failing to interview and call defendant's sister Iman to provide evidence that defendant had no animus against Alobidi for divorcing his sister. It was reasonable for defense counsel to not call Iman as a witness. Everything Iman would have testified to came through other witnesses. Iman's affidavit stated that Alobidi and defendant were friends and that defendant supported her decision to divorce Alobidi. Defendant testified without contradiction that he vouched for Alobidi when his father queried him about Alobidi prior to granting permission for the marriage. Alobidi also testified without contradiction that it was Iman's decision to divorce and that at the time of trial, he and Iman were actually married again. Defendant testified that he had the marriage and divorce paperwork to aid his sister in obtaining documents from a local mosque for the divorce. Thus, Iman's testimony would have been duplicative. Further, even if defense counsel had chosen to call Iman to testify, it is unlikely that she would have been able to come to the United States to do so given Alobidi's

---

to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." MRE 803(3).

[3] " In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct." MRE 405(a).

testimony concerning their complicated immigration issues and his unsuccessful efforts to bring Iman here as his wife.

The sum of defendant's ineffective assistance of counsel claim, as it relates to the failure to call and investigate witnesses, is that defense counsel failed to pursue an alternative theory. Defendant's defense to the solicitation of murder charge was that he was framed by Khalasawi. Defendant's alternative theory was that Khalasawi and Alzand framed him. Defendant's affidavits are in support of the alternative theory. In retrospect, defendant is not happy with the outcome of defense counsel's chosen strategy. This Court will not find counsel ineffective for choosing a strategy that ultimately failed. *People v Kevorkian*, 248 Mich App 373, 414–415; 639 NW2d 291 (2001).[4]

Defendant also claims that if Wittbort were called to testify, he would have testified in accord with his affidavit:

> I know Detective Chad Jackson from the Hazel Park Police Department, because I have played golf with him. About six months before January 2017 (well before Khalasawi said that Aldolemy contacted him about Aldolemy's brother in law), I golfed with Chad Jackson and my former partner in Rochester, Michigan. Jackson told my former partner and me that he was working a solicitation of murder case. I asked him, "Why? You don't have the experience to do that type of case. You do auto theft investigations." Jackson said, "No. I got this. We got this Chaldean guy balls to walls." To my knowledge, the only solicitation case that Chad Jackson has ever handled is the case against Moe Aldolemy.

Wittbort's statement is not only hearsay, but if offered for the truth of the matter asserted, it implies that Detective Chad Jackson (Jackson) was involved with Khalasawi and Alzand in framing a case against the defendant. This serious accusation may be the lone reason that defense counsel did not call Wittbort as a witness. It was not unreasonable for defense counsel to avoid placing this allegation before the jury altogether because if it were successfully contradicted, then Wittbort and the witnesses he investigated would lose credibility. The record otherwise showed that it was Finkbeiner who involved Jackson in this case on January 27, 2017.

Defendant lastly argues that defense counsel was ineffective for failing to investigate and disclose the full extent of Khalasawi's plea to the jury, including whether any promises were made to Khalasawi concerning his deportation case. Khalasawi's immigrant status and risk of deportation was disclosed before the jury to the extent that any of the parties to this case were

---

[4] Defendant's contention, that defense counsel failed to investigate witnesses that would have proven his alternative theory, is further inaccurate. Defense counsel used Wittbort's report for its intended purpose, as an investigation of possible witnesses for the defense. Defendant does not argue why it was necessary for defense counsel to re-interview proposed witnesses that Wittbort already interviewed. The decision not to call those witnesses was therefore not based on a failure to investigate.

aware of it.  In fact, Khalasawi appeared at trial in a jumpsuit and testified that he was in a jumpsuit because he was an immigrant of Iraq being detained by Homeland Security.

Defense counsel also thoroughly cross-examined Finkbeiner, the officer in charge of Khalasawi's arson case, on the issue of Khalasawi's plea bargain at trial.  The jury learned from Finkbeiner that in May 2017, Khalasawi entered a plea of no contest to receiving and concealing stolen property in exchange for dismissal of the arson related charges and his continued cooperation in the solicitation to murder case against the defendant.  Finkbeiner agreed that Khalasawi's plea was to "a much less serious charge" and that if Khalasawi did not continue to cooperate, he would lose the benefits of his plea bargain and the more serious charges would be reinstated.  He further agreed that Khalasawi ultimately received a sentencing agreement that included only fines, fees and costs, and no jail or probation.  The jury learned that Khalasawi was later allowed to withdraw his May 2017 plea for an even lesser charge and that this lesser charge was offered "in the hope that it might help avert [Khalasawi's] immigration consequences."

Khalasawi's attorney representing him in the arson case, Johnston, agreed that there was ultimately a *Cobbs*[5] agreement in Khalasawi's arson case that Khalasawi would plead no contest to a high court misdemeanor and receive no jail time.  He agreed that in May 2017, Khalasawi entered a no contest plea to a reduced charge of attempted receiving or concealing stolen property.  Johnston also agreed that Khalasawi was able to withdraw the May 2017 plea and plead to a further reduced charge.  Johnston acknowledged that the original charge of arson conspiracy carried a maximum sentence of 20 years and the reduced charges only carried a potential sentence of up to two years.

It is clear from the record, that outside of identifying the exact counts of arson Khalasawi was charged with and that exact counts that were dismissed, defense counsel's performance was not deficient in investigating and presenting the full scope of Khalasawi's criminal proceedings concerning his arson charges.  Defense counsel had obtained the transcripts from Khalasawi's plea proceedings from Macomb County concerning the arson as evidenced by his use of the transcripts to cross-examine Johnston.  He also provided an affidavit for defendant's use in this appeal that acknowledged he was aware of Khalasawi's deportation proceedings and relied on the prosecutor's information that Khalasawi was facing imminent deportation.  Defense counsel's reliance on that information was not unreasonable where on appeal, plaintiff represents that Khalasawi was already ordered to be deported by an immigration court and was appealing that decision to the Sixth Circuit Court of Appeals.  Defense counsel averred in his affidavit, that he did not ask the prosecutor or Khalasawi's attorney, Johnston, while Johnston was on the stand, about whether any promises were made to Khalasawi to aid him with his deportation case.  However, defense counsel's reliance on the record of the plea proceedings in Macomb County was reasonable and did not constitute deficient performance.  A review of the plea transcripts reveals that Khalasawi ultimately received a significantly reduced plea from his original arson charges, but there was always the understanding that either of Khalasawi's no contest pleas could result in his deportation.  For example,

---

[5] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

*Court*:  Did you have an opportunity to discuss this with Mr. Khalasawi's attorney?

*Prosecutor*:  Yes, I did.

*Court*:  And you advised him of the potential for deportation associated with this plea?

*Prosecutor*:  Yes, and I believe Mr. Khalasawi understands that sort of risk.

*Court*:  All right.  Having had that opportunity, I understand there's certain conditions that would weigh favorably, but not necessarily guaranty that he would not be deported.

Defendant suggests that this particular colloquy indicated that there was some other explicit or implicit off-the-record promise concerning Khalasawi's immigration.  The colloquy equally and plainly also suggested that "the conditions" referred to were not outside promises, but rather the fact that the plea agreed to was of the kind that they mistakenly thought was less likely to result in Khalasawi's deportation.  Otherwise, Khalasawi was asked, and testified under oath at the plea proceedings that there were no other promises, threats, inducement or coercion to get him to plea to the reduced charges.  Even if defense counsel had discovered that the Oakland County prosecutor offered to aid Khalasawi in his deportation proceedings, defendant fails to explain how that would affect the outcome of his case when the jury clearly heard Finkbeiner already testify that the reduced plea was offered "in the hope that it might help avert [Khalasawi's] immigration consequences."

In sum, we find that defendant received the effective assistance of counsel.  Accordingly, remand for an evidentiary hearing on defendant's ineffective assistance of counsel claims is not necessary.

## III.  MRE 404(B)

Defendant argues that the trial court erred in allowing Khalasawi to testify that defendant hired him to burn down defendant's gas station because the arson was a separate bad act that had nothing to do with the solicitation to murder, and defendant was not given notice of the prosecutor's intent to introduce the evidence.  We agree in part, and disagree in part.

## A.  STANDARD OF REVIEW

We review the trial court's decision to admit evidence for an abuse of discretion.  *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).  "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes."  *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008).  Preserved evidentiary "error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative."  *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).

## B.  ANALYSIS

MRE 404(b) provides:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

(2) The prosecution in a criminal case shall provide written notice at least 14 days in advance of trial, or orally on the record later if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.

MRE 404(b) "is a rule of legal relevance" that "limits only one category of logically relevant evidence": "[i]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible." *People v VanderVliet*, 444 Mich. 52, 61-63; 508 NW2d 114 (1993). The rule "is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010). "Requiring the prosecution to give 'pretrial notice of its intent to introduce other acts evidence at trial' is designed to 'promote [ ] reliable decision making,' to 'prevent[ ] unfair surprise,' and to 'offer [ ] the defense the opportunity to marshal arguments regarding both relevancy and unfair prejudice.' " *People v Jackson*, 498 Mich 246, 261; 869 NW2d 253 (2015) quoting *VanderVliet*, 444 Mich at 89 n 51.

Res gestae evidence is evidence that is " 'so blended or connected with' " the charged offense " 'that proof of one incidentally involves the other or explains the circumstances of the crime.' " *People v Delgado*, 404 Mich 76, 83; 273 NW2d 395 (1978) (citations omitted). The evidence must have "a causal, temporal or spatial connection with the charged crime. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *United States v Hardy*, 228 F3d 745, 748 (CA 6, 2000).

It is the nature of things that an event often does not occur singly and independently, isolated from all others, but, instead, is connected with some antecedent event from which the fact or event in question follows as an effect from a cause. When such is the case and the antecedent event incidentally involves the commission of another crime, the principle that the jury is entitled to hear the 'complete story' ordinarily

supports the admission of such evidence. [*People v Sholl*, 453 Mich 730, 742; 556 NW2d 851 (1996) (citations omitted)].

"[T]here is no 'res gestae exception' to MRE 404(b)"; meaning that the trial court cannot admit other acts evidence that satisfies the definition of res gestae evidence without complying with MRE 404(b). *Jackson*, 498 Mich at 270, 274.

Khalasawi's testimony that defendant hired him to burn down defendant's own gas station provided additional context to the relationship between the two men, including the animus upon which much of the defense theory was based. Even so, res gestae evidence must comply with MRE 404(b), *Jackson*, 498 Mich at 268-269, and Khalasawi's testimony was clearly evidence of defendant's other bad acts under the rule. Thus, the court's failure to analyze the evidence under that rule was error.

Notwithstanding the court's failure to analyze the testimony under MRE 404(b), the evidence was relevant for a non-propensity purpose. Under the rule, evidence of defendant's other bad acts is admissible to show, *inter alia*, "scheme, plan, or a system in doing an act." MRE 404(b)(1). Khalasawi's testimony that defendant had hired him before to commit the arson was admissible to show defendant's scheme or plan of hiring persons to commit criminal acts for him for compensation. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The evidence provided defendant with an additional motive to argue that Khalasawi sought revenge against him and was used to attack Khalasawi's credibility in testifying against defendant as part of his cooperation for his arson plea. The court further instructed the jury not to consider the evidence to show that defendant was a bad person.

While it is undisputed that the prosecutor did not provide pretrial notice of the other acts evidence under MRE 404(b), the defendant must demonstrate that this error "more probably than not ... was outcome determinative." *Jackson*, 498 Mich at 270 (citation omitted). Defense counsel stated that despite there not being any notice, he was not surprised. In fact, defense counsel objected to Khalasawi's testimony because he anticipated that Khalasawi was going to implicate defendant in the arson. Defense counsel was fully aware of Khalasawi's plea proceedings in the arson case. Although the defendant was not afforded his opportunity to cross-examine Finkbeiner or introduce a Facebook page, he has not shown that either argument would have been helpful. Defendant's stated reason for wanting to cross-examine Finkbeiner was to impeach Khalasawi's testimony, but defendant admits that Khalasawi's credibility was impeached in numerous other ways and that the prosecution's case was weak because of the impeachment. Additionally, the introduction of Alzand's Facebook page to show that he, Alobidi, and Alzand were friends did not prejudice defendant when Khalasawi never denied knowing Alobidi, admitted that Alobidi was friends with Alzand, and testified that he was unaware that Alzand listed him and Alobidi as his first Facebook friends. "Consequently, this case does not invoke the Supreme Court's concern that, without notice, the prosecutor was able to use irrelevant, inadmissible prior bad acts evidence to secure [defendant's] conviction." *People v Hawkins*, 245 Mich App 439, 455; 628 NW2d 105 (2001).

## IV. PROSECUTORIAL MISCONDUCT

Defendant argues the prosecutor committed misconduct in four instances. We disagree.

A.  ISSUE PRESERVATION AND STANDARD OF REVIEW

Defendant did not preserve his claims of prosecutorial misconduct by simultaneous objection.  *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).

"This Court reviews claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *Aldrich*, 246 Mich App at 110.  Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights.  *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999).  "To avoid forfeiture of . . . unpreserved claims of prosecutorial misconduct, defendant must establish that errors occurred, these errors were clear or obvious, and the errors affected the outcome of the trial court proceedings." *People v Schultz*, 246 Mich App 695, 709; 635 NW2d 491 (2001).  "No error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction." *People v Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000).

B.  ANALYSIS

The test for prosecutorial misconduct is "whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015).

Defendant first argues that the prosecutor violated *Brady v Maryland*[6] with the suppression of favorable evidence; specifically, that the prosecutor suppressed implicit or explicit promises that were a part of Khalasawi's plea that, if exposed, would question Khalasawi's credibility. Defendant further contends that the prosecutor's failure to correct testimony regarding the extent of the plea bargain worked to vouch for Khalasawi's credibility and bolstered the prosecution's case.

> In order to establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could the defendant have obtained it with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. [*People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005)].

Defendant fails to prove that the prosecution suppressed favorable evidence.  The full extent of Khalasawi's plea deal was told to the jury through Finkbeiner's, Johnston's, and Khalasawi's testimony.  Further, the plea proceedings were a matter of public record which defense counsel obtained and used on cross-examination.

Defendant also argues that the prosecutor allowed false testimony concerning the plea bargain and failed to correct it.  Defendant's contention is inaccurate.  The register of actions for

---

[6] 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Khalasawi's arson case shows that Khalasawi was arraigned in January 2016. Khalasawi's trial in the arson case was scheduled for January 24, 2017, but rescheduled. Defendant assumes that the rescheduling was a benefit that Khalasawi received as a part of a plea agreement involving the solicitation to murder case. However, Finkbeiner, the officer in charge of the arson case, testified that he contacted Jackson of the Hazel Park police station on January 27, 2017, because the solicitation to murder occurred outside Finkbeiner's Sterling Heights' jurisdiction. Thus, neither Macomb or Oakland County became involved in the solicitation to murder case until after the arson trial was adjourned. Further, Johnston testified that while there were discussions about the information Khalasawi had, there was not a plea reached regarding Khalasawi's cooperation in the solicitation to murder case until May 2017 with the plea to attempted larceny in a building.

Defendant also argues that the prosecutor denigrated defendant's character during opening statement. Defendant is specifically referring to the prosecutor's remark in opening statement that "if you are going to try the devil, and I don't mean to say that the defendant is the devil, but sometimes you have to go to hell to get your witnesses." When the entire statement is read in context, there was no evidence of prosecutorial misconduct because the prosecutor was plainly talking about the character of his own witness, Khalasawi, and explicitly said that he was not referring to the defendant as the devil. Further, this remark was made during the prosecutor's opening argument. The jury was instructed that the lawyer's arguments were not evidence and should not be considered as such. A prosecutor's improper argument may be cured by a cautionary instruction that the arguments of counsel are not evidence. *People v Abraham*, 256 Mich App 265, 276; 662 NW2d 836 (2003).

Defendant additionally argues that the prosecutor improperly offered testimony of his own opinion in closing argument concerning the defendant's testimony that he was purchasing used kitchen equipment. Prosecutors "are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236 (internal citation omitted). After a review of the record, we conclude that the prosecutor's comments did not constitute prosecutorial misconduct. Instead, the prosecutor properly argued the plausibility of defendant's version of events. A prosecutor is free to argue "that a witness is not worthy of belief." *People v Caldwell*, 78 Mich App 690, 692; 261 NW2d 1 (1977). Further, the remarks were made during the prosecutor's closing argument. The jury was instructed that the lawyer's arguments were not evidence and should not be considered as such. Any prejudice resulting from a prosecutor's improper argument may be cured by a cautionary instruction that the arguments of counsel are not evidence. *People v Abraham*, 256 Mich App 265, 276; 662 NW2d 836 (2003).

Defendant further argues that counsel was ineffective for not objecting to the above allegations of prosecutorial misconduct. However, where defendant fails to prove his claims of prosecutorial misconduct, so do his claims of ineffective assistance based on the same misconduct fail. "[D]efendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## V. MRE 404(A)

Defendant argues that the trial court erred in admitting Adam Whiting's testimony that defendant had some violent tendencies because the testimony was improper character evidence.

We agree that the testimony should not have been admitted, but disagree that its admission constitutes error requiring reversal.

## A. ISSUE PRESERVATION AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Aldrich*, 246 Mich App at 113; 631 NW2d 67 (2001). Defense counsel objected to the admission of the evidence at trial on the ground that it was irrelevant, but not for the reasons on appeal that it was improper character evidence or that it denied the defendant a fair trial, therefore this issue is unpreserved.

We review unpreserved evidentiary error for plain error affecting defendant's substantial rights. *People v Coy*, 258 Mich App 1, 16; 669 NW2d 831 (2003). A defendant's substantial rights are affected if the error affects the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. ANALYSIS

Whiting was one of the officers positioned in the area of the Kabab and More to effectuate defendant's arrest on January 31, 2017, after defendant met with Khalasawi at the restaurant to pay Khalasawi for supposedly murdering Alobidi. While surveilling defendant, Whiting noticed that when defendant's vehicle came to a stop, defendant's hands left the wheel and went down. Whiting testified that he relayed this information over the radio. When the prosecutor asked Whiting why he relayed that information over the radio, Whiting responded, "We received information in our briefing that he had some violent tendencies—" Whiting then proceeded to testify, over defense counsel's objection, about the importance of relaying the information to fellow officers over concern that the suspect might have a gun. The following day, jurors asked that their faces not be shown on television by news crews recording the trial. Defendant attributes this request to the jury being afraid of defendant after Whiting's testimony.

Whiting's testimony that defendant had some violent tendencies was improper character evidence under MRE 404(a).[7] There was no evidence of record that defendant was a violent person, nor was the evidence relevant to any fact issue at trial. Defense counsel objected and the court's response was more to the prosecution's comment that the testimony was not solicited, rather than a ruling on defendant's objection that the testimony was irrelevant.

The erroneous admission of evidence is not a basis for reversal unless the error affected the outcome of the proceedings, and in defendant's case, it did not. Whiting's entire testimony was brief, and this particular portion of his testimony was unsolicited, objected to, and not raised again. To argue that the jurors were concerned over their safety when they inquired about the television cameras in the courtroom the following day is conjecture when it was equally plausible that their concerns were over privacy and just not wanting to be on television. Otherwise,

---

[7] "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . ." MRE 404(a).

Whiting's brief comment did not affect the outcome of defendant's case in light of the overwhelming evidence of defendant's guilt. Whiting's testimony did not affect Khalasawi's testimony that defendant solicited him to murder Alobidi. Nor did it affect the evidence of Nasser's testimony that he took a picture of Alobidi off defendant's phone and forwarded the picture, plus what turned out to be Alobidi's address to Khalasawi from the defendant. The evidence of the recorded phone calls between Khalasawi and defendant and that defendant later showed up with the money promised in exchange for murdering Alobidi was unaffected. Police discovered Alobidi's wallet wedged between the two front seats and, Alobidi and Iman's divorce and marriage paperwork. Further, Alobidi testified that he was not surprised that defendant would try to kill him. On this record, defendant fails to establish that the erroneous admission of Whiting's testimony affected his substantial rights.

## VI. OV 10

Defendant argues the trial court erred in scoring OV 10 at 15 points when there was no evidence that Alobidi was a vulnerable victim nor that he was exploited. We disagree.

### A. STANDARD OF REVIEW

We review for clear error a trial court's factual determinations supporting its assessment of offense variable points. *People v Gloster*, 499 Mich 199, 204; 880 NW2d 776 (2016). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Clear error exists when the Court is "left with a definite and firm conviction that a mistake has been made." *People v Stone*, 269 Mich App 240, 242; 712 NW2d 165 (2005).

### B. ANALYSIS

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40(1). MCL 777.40(1)(a) directs that 15 points be assessed when the defendant engaged in "predatory conduct." "Predatory conduct" is defined as "preoffense conduct directed at a victim . . .for the primary purpose of victimization." MCL 777.40(3)(a). It "does not encompass *any* 'preoffense conduct,' but rather only those forms of 'preoffense conduct' that are commonly understood as being 'predatory' in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or 'preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection.'" *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011). Preoffense conduct is not "predatory if its main purpose is other than making the potential victim an actual victim." *People v Cannon*, 481 Mich 152, 161; 749 NW2d 257. (2008) "Victimize" is defined as "to make a victim of." *Id*. (Citation omitted). "Victim" is defined as "1. a person who suffers from a destructive or injurious action or agency .... 2. a person who is deceived or cheated...." *Id*. (Citation omitted). "[P]oints should be assessed under Ov. 10 only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *Id*. at 157–158. We consider the following factors when determining if the victim was vulnerable:

(1) the victim's physical disability, (2) the victim's mental disability, (3) the victim's youth or agedness, (4) the existence of a domestic relationship, (5) whether the offender abused his or her authority status, (6) whether the offender exploited a victim by his or her difference in size or strength or both, (7) whether the victim was intoxicated or under the influence of drugs, or (8) whether the victim was asleep or unconscious. [*Id*. at 158–159.]

A victim need not be inherently vulnerable; rather, "a defendant's 'predatory conduct,' by that conduct alone (*eo ipso*), can create or enhance a victim's 'vulnerability.' " *Huston*, 489 Mich at 454.

The trial court's finding that OV 10 should be scored at 15 points was not clearly erroneous. There was testimony that Khalasawi and Alobidi were acquaintances where Khalasawi knew of Alobidi from his carpentry work. Defendant argues Khalasawi and Alobidi were good friends. Considering either relationship, defendant's choice of Khalasawi to murder Alobidi was preoffense predatory conduct not only aimed at injuring Alobidi, but to make him more vulnerable to attack. Alobidi testified that he suspected defendant would try to hurt him for having divorced defendant's sister. However, Khalasawi was not similarly on Alobidi's radar. Alobidi was vulnerable to an attack from Khalasawi because it would have been unexpected, confusing and shocking. Accordingly, a preponderance of the evidence supports finding that defendant engaged in preoffense predatory conduct directed at a vulnerable victim for the purpose of victimization.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto

-16-